BRADLEY J. BONDI, *Pro Hac Vice*
BENJAMIN W. SNYDER, *Pro Hac Vice*
Paul Hastings LLP
2050 M St. NW
Washington, D.C. 20036
Telephone: (202) 551-1700
Facsimile: (202) 551-0201
Email: bradbondi@paulhastings.com
Email: bensnyder@paulhastings.com

RENATO MARIOTTI, State Bar No. 226447
Paul Hastings LLP
71 S. Wacker Dr., Suite 4500
Chicago, IL 60606
Telephone: (312) 499-6005
Facsimile: (312) 499-6105
Email: renatomariotti@paulhastings.com

*Counsel for Defendant SUNEET SINGAL*

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA
### SACRAMENTO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | Case No. 2:22-CR-0068-DJC |
| *Plaintiff*, | **POST-VERDICT RULE 29 MOTION FOR ACQUITTAL** |
| v. | Date: January 8, 2026 |
| SUNEET SINGAL, | Time: 9:00 AM |
| *Defendant*. | Judge: Hon. Daniel J. Calabretta |
| | Trial Date: June 16, 2025 |
| | Date Action Filed: April 7, 2022 |

# TABLE OF CONTENTS

Page

BACKGROUND ...................................................................................................... 2

    A.    Mr. Singal Decides To Sell FC Retail. ......................................................... 2

    B.    The Membership Purchase Agreement Included Explicit Closing
        Obligations To Effectuate the Sale. ............................................................. 3

    C.    Mr. Prasad Signs the Agreement but Fails To Otherwise Comply
        with His Closing Obligations Pursuant to the Purchase Agreement. .......... 4

    D.    Mr. Singal Continues To Operate FC Retail as Its Owner for Months
        Following the Signing of the Purchase Agreement. ..................................... 5

    E.    Following the Completion of the Sale, Mr. Prasad Assumes
        Ownership of FC Retail. ............................................................................... 7

    F.    The Government Brings Charges that Mr. Singal Misrepresented
        Ownership of FC Retail on Loan Documents. ............................................. 7

    G.    The Court Defers Its Ruling Concerning Mr. Singal's Ownership of
        FC Retail Until After Trial. ............................................................................ 8

ARGUMENT ......................................................................................................... 9

I.    NO REASONABLE JUROR COULD HAVE FOUND THAT MR. SINGAL
    MADE A MATERIAL MISREPRESENTATION BECAUSE HE OWNED FC
    RETAIL WHEN HE REPRESENTED SUCH IN THE MCAs. ............................... 9

    A.    The Exchange of Mr. Singal's Ownership Interest in FC Retail and
        Mr. Prasad's Requisite Documents Were Mutually Concurrent
        Conditions. .................................................................................................. 9

    B.    When Mr. Prasad Failed To Meet His Concurrent Obligations, Mr.
        Singal Retained Ownership of FC Retail. .................................................. 11

    C.    Mr. Prasad's Newfound Belief that He Was Not Bound by the
        Purchase Agreement's Written Requirements Is of No
        Consequence. ........................................................................................... 12

    D.    The Government Did Not Prove Beyond a Reasonable Doubt that
        Mr. Singal Made a False Statement When He Asserted He Owned
        FC Retail in His MCA Applications. ........................................................... 15

    E.    Mr. Singal's SEC Testimony Has No Bearing Here. .................................. 16

II.    A RATIONAL JUROR COULD NOT FIND BEYOND A REASONABLE
    DOUBT THAT MR. SINGAL HAD THE INTENT TO DEFRAUD. ....................... 17

CONCLUSION ...................................................................................................... 20

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Bleecher v. Conte*,
  29 Cal. 3d 345, 698 P.2d 1154 (1981) ........................................................ 9

*Chodos v. W. Publ'g Co.*,
  292 F.3d 992 (9th Cir. 2002) ..................................................................... 11

*Colaco v. Cavotec SA*,
  25 Cal. App. 5th 1172, 236 Cal. Rptr. 3d 542 (2018) ................................ 10

*Est. of Duke*, 61 Cal. 4th 871, 352 P.3d 863 (2015) ...................................... 13

*Francis H. Leggett & Co. v. Cnty. of Los Angeles*,
  235 Cal. App. 2d 752, 45 Cal. Rptr. 561 (Ct. App. 1965) .......................... 18

*Katemis v. Westerlind*,
  120 Cal. App. 2d 537, 261 P.2d 553 (1953) .............................................. 10

*Kerr v. Reed*,
  187 Cal. 409, 202 P. 142 (1921) ................................................................ 10

*Ninety Nine Invs. v. Overseas Courier Serv. (Singapore) Priv.*,
  113 Cal. App. 4th 1118, 6 Cal. Rptr. 3d 891 (2003) .................................. 10

*Oceanside 84, Ltd. v. Fid. Fed. Bank*,
  56 Cal. App. 4th 1441, 66 Cal. Rptr. 2d 487 (1997) .................................. 18

*In re Rauf*,
  504 B.R. 838 (Bankr. E.D. Mich. 2014) ..................................................... 19

*Rubin v. Fuchs*,
  1 Cal. 3d 50, 459 P.2d 925 (1969) ............................................................ 10

*S. Cal. Edison Co. v. Superior Ct.*,
  37 Cal. App. 4th 839, 44 Cal. Rptr. 2d 227 (1995), *as modified on denial
  of reh'g* (Sept. 7, 1995) ............................................................................. 18

*Secrest v. Sec. Nat'l Mortg. Loan Tr.
  2002-2*, 167 Cal. App. 4th 544, 84 Cal. Rptr. 3d 275 (2008), *as modified
  on denial of reh'g* (Nov. 3, 2008) .............................................................. 13

*Southland Corp. v. Emerald Oil Co.*,
  789 F.2d 1441 (9th Cir. 1986) ................................................................... 10

*Stewart v. Preston Pipeline Inc.*,
  134 Cal. App. 4th 1565, 36 Cal. Rptr. 3d 901 (2005) ................................ 13

*Tas-T-Nut Co. v. Cont'l Nut Co.*,
  125 Cal. App. 2d 351, 270 P.2d 43 (1954) ................................................. 11

*United States v. Bennett*,
  No. SA CR 03-25 (B) AHS, 2006 WL 8435170 (C.D. Cal. May 24, 2006).................. 9

*United States v. Connolly*,
  24 F.4th 821 (2d Cir. 2022) ...................................................... 16

*United States v. Galecki*,
  89 F.4th 713 (9th Cir. 2023), *cert. denied*, 145 S. Ct. 546 (2024) ............................ 17

*United States v. Scarmazzo*,
  554 F. Supp. 2d 1102 (E.D. Cal. 2008), *aff'd sub nom. United States v.*
  *Montes*, 421 F. App'x 670 (9th Cir. 2011) .................................................. 17

*United States v. Tarallo*,
  380 F.3d 1174 (9th Cir. 2004), *amended*, 413 F.3d 928 (9th Cir. 2005) .................. 17

*Wind Dancer Prod. Grp. v. Walt Disney Pictures*,
  10 Cal. App. 5th 56, 215 Cal. Rptr. 3d 835 (2017) .................................... 14

**Statutes**

15 U.S.C. § 80a-2(a)(3) ................................................................. 3

Ca. Civ. Code § 1624 ................................................................. 13

Cal. Civ. Code § 1624(a)(7) ........................................................... 13

Ca. Civ. Code § 1698 ................................................................. 13

Investment Company Act of 1940, 15 U.S.C. § 80a-1 et seq. .......................... 3

**Rules**

Fed. R. Crim. P. 29 ...................................................... 1, 8, 9, 17

Fed. R. Crim. P. 29(c) ................................................................. 9

1   　　　Suneet Singal must be acquitted of the mail and wire fraud charges against him
2   because the allegedly **false** statements at the heart of this case were **true** as a matter of
3   law.  The government argued that Mr. Singal devised a scheme to defraud merchant
4   lenders through "false statements" in which he represented that he owned First Capital
5   Retail, LLC ("FC Retail").  Ex. A at 3 (6/23/25 Tr. 8:13–14).  But the record at trial revealed
6   that those statements were absolutely true.  It is undisputed that Rameshwar Prasad had
7   contractual obligations under the Membership Purchase Agreement ("Purchase
8   Agreement") that needed to be completed in order to effectuate the sale of FC Retail, and
9   that those obligations remained outstanding when Mr. Singal made the charged
10  statements.  As a result, Mr. Singal still owned FC Retail when he said he did.  No
11  reasonable juror could have found otherwise, because California law precludes such a
12  finding.

13  　　　The Court previewed this very outcome already, when it requested "full briefing" on
14  the issue—specifically, whether the parties could have modified the contract orally—"post-
15  trial . . . [b]ecause if you're right, as a matter of law, I think that['s] a complete and absolute
16  defense[.]"  Ex. B at 4 (6/20/25 Tr. 10:8–15).  The Court made clear: "[I]f you're right, I
17  think we're done here." *Id.* (Tr. 10:13–15).  Consistent with this Court's request, Mr. Singal
18  submits this Rule 29 motion, setting forth two reasons why a judgment of acquittal should
19  be entered here.

20  　　　**First**, as the plain language of the Purchase Agreement and the parties'
21  subsequent conduct make clear, Mr. Singal **was still the legal owner of FC Retail** when
22  he submitted the merchant cash applications ("MCAs") in the spring of 2017—the only
23  false statements the government alleged.  It is uncontested that the Purchase Agreement
24  required Mr. Prasad to deliver a Promissory Note for $11.5 million, a Pledge Agreement,
25  a Security Agreement, and Company Guaranty to effectuate the sale.  And it is
26  uncontested that Mr. Prasad did not deliver these documents until later that summer, **well**
27  **after** Mr. Singal completed the allegedly false loan applications.  That means, as a matter
28  of law, there was no false representation.

RULE 29 MOTION

**Second**, no rational juror could have found that Mr. Singal had the requisite intent to defraud because the evidence at trial showed that neither he nor Mr. Prasad believed Mr. Singal had transferred ownership at the time of the alleged false statements.  Both men's conduct in the months after they signed the Purchase Agreement demonstrated that they thought Mr. Singal still owned FC Retail—most notably when Mr. Prasad requested a raise from Mr. Singal on July 7, 2017, something he would only do if he understood Mr. Singal to be the owner of FC Retail.  As a result, even if the parties were operating under a mistaken understanding of California contract law, Mr. Singal nevertheless **believed** that the deal had not yet gone through when he completed the loan applications.

For these reasons and those set forth below, the Court should set aside the jury's verdict and enter an acquittal.

<strong>BACKGROUND</strong>

**A.    Mr. Singal Decides To Sell FC Retail.**

Mr. Singal is a successful entrepreneur.  He oversaw a variety of business ventures, including the ownership and operation of First Capital Real Estate Investments ("FC REI") and its wholly owned subsidiary, FC Retail.  *See* Ex. B at 8-9 (Tr. 28:17–29:3).  FC Retail consisted of a portfolio of fifteen Cinnabon baked-good stores.  *Id.* (Tr. 28:25–29:3).

Mr. Singal hired Mr. Prasad to manage FC Retail and the day-to-day operations of the Cinnabon franchises.  Ex. B at 9-10 (Tr. 29:23–30:8).  As president of FC Retail, Mr. Prasad supervised the Cinnabon franchises' regional managers.  *Id.* at 10 (Tr. 30:3–8).  Mr. Singal paid Mr. Prasad and other of his employees through his payroll company, First Capital Management.  *Id.* (Tr. 30:9–13).

Under Mr. Singal's leadership, the Cinnabon stores proved successful.  *See* Ex. B at 10 (Tr. 30:14–17).  Yet given the cyclical nature of the Cinnabon franchises' cash flow, with profits primarily picking up during the holiday season, FC Retail occasionally required outside funding.  *Id.* (Tr. 30:14–23).  So in early 2017, Mr. Singal entered into conversations with Jeffrey McClure, the CEO of the business development company

("BDC") Freedom Capital Investment Corp. ("Freedom Capital"), regarding a possible sale of FC Retail.  *Id.* at 11, 12-13 (Tr. 31:14–22, 32:6–16, 32:21–33:4); Ex. C at 37 (6/17/25 Tr. 147:15–21).  That sale never materialized, and Freedom Capital instead decided to issue a loan to FC Retail.  Ex. C at 37-38, 39 (Tr. 147:24–148:10, 149:14–15).

To secure the loan, Mr. Singal consulted with his attorneys to ensure no issues arose under the Investment Company Act of 1940, 15 U.S.C. § 80a-1 et seq. ("the 40 Act"), which prohibits BDCs from loaning money to "affiliated" entities.  *See* 15 U.S.C. § 80a-2(a)(3); Ex. C at 38 (Tr. 148:1–22).  Some of Mr. Singal's attorneys expressed concern that Mr. Singal's dual ownership of FC Retail and FC REI could be considered "affiliate entities," and complicate the loan.  Ex. B. at 12-13 (Tr. 32:19–33:9).  The parties resolved Mr. Singal would divest himself of his ownership interest in FC Retail.  Ex. C at 39 (Tr. 149:7–11).

### B.    The Membership Purchase Agreement Included Explicit Closing Obligations To Effectuate the Sale.

As part of these broader efforts, Mr. Singal decided to sell FC Retail to its president, Mr. Prasad.  *See* Ex. B at 13, 32 (Tr. 33:10–25, 62:13–14).  A Purchase Agreement dictated the terms of the sale.  *See* Ex. D (Gov. Ex. 101); Ex. C at 22 (Tr. 91:3–7).  Section 1.1 of the Purchase Agreement states, "At the Closing, the Seller shall sell to the Buyer, and the Buyer shall purchase from the Seller, all of the Seller Units."  Pursuant to the Purchase Agreement, FC REI agreed to transfer "One Hundred Percent (100%) ownership interest" in FC Retail to Mr. Prasad for $11,500,000.  Ex. D at 1 (Purchase Agreement at 1, § 1.1).  Mr. Prasad was to pay the purchase price through a Promissory Note, with an interest rate of 6% to be deferred for 12 months following the note's execution.  *Id.* at 1(§ 1.2).  To secure the Promissory Note, the Purchase Agreement also required Mr. Prasad to execute a pledge agreement, insurance policies, a guaranty agreement, and a security agreement.  *See id.* at 1-2 (§§ 1.3, 1.3.1, 1.3.3, 1.3.4, 1.3.5).

The Purchase Agreement contemplated a one-time concurrent exchange of consideration at the offices of FC Retail on the "Closing Date."  Ex. D at 2 (§ 2.1).  Mr.

Prasad would "deliver or cause to be delivered" to FC REI "(a) an executed original of the Promissory Note; (b) an executed original of the Pledge Agreement; (c) an executed original of the Security Agreement; [and] (d) an executed original of the Company Guaranty."  *Id.* at 2 (§ 2.2.2).   In turn, FC REI would deliver the "membership unit certificates representing the Seller Units" and an "executed Pledge Agreements and Security Agreement."  *Id.* at 2 (§ 2.2.1).

The Purchase Agreement also specified that "[n]o term or provision of this agreement may be amended, waived, discharged, or terminated orally, but only by an instrument in writing signed by the party against whom the enforcement of such amendment, waiver, discharge, or termination is sought."  Ex. D at 21 (§ 9.8); *see also* Ex. B at 5 (Tr. 11:4–8).

The parties determined the "Closing Date" would be the date on which they signed the Purchase Agreement, February 23, 2017.  Ex. D at 1.  The parties agreed the contract was to be "made effective as of" the Closing Date, when they would complete their Closing Obligations per § 2.2.  *Id*. at 2

Upon signing the Purchase Agreement, the parties delivered the signed agreement to Freedom Capital.  *See* Ex. C at 43-44 (Tr. 156:5–10, 157:8–13).   Freedom Capital issued its $1.5 million loan the next day, on February 24, 2017.  *See* Ex. C at 42 (Tr. 155:13–16); Ex. F (Gov. Ex. 106).

### C. Mr. Prasad Signs the Agreement but Fails To Comply with His Closing Obligations Pursuant to the Purchase Agreement.

Although the parties signed the Purchase Agreement on February 23, the date they deemed the Closing Date, Mr. Prasad did not meet his "Closing Obligations" outlined in § 2.2.  Mr. Prasad did not provide the Promissory Note as required by § 2.2.2(a).  Ex. F at 7-8 (6/18/25 Tr. 24:24–25:2).  He did not deliver the Pledge Agreement as required by § 2.2.2(b).  *Id.* at 8 (Tr. 25:3–6).  He failed to provide the Security Agreement as required by § 2.2.2(c).  *Id.* (Tr. 25:7–10).  And he did not deliver the Company Guaranty as required by § 2.2.2(d).  *Id.* (Tr. 25:11–14).

During trial, Mr. Prasad recognized that the Purchase Agreement obligated him to deliver these documents at the Closing on the Closing Date.  Ex. F at 6 (Tr. 23:10–15) (agreeing that it was "mandatory" that he deliver the documents to the seller).  Mr. Prasad further acknowledged that the Promissory Note was necessary "to finish out the deal."  *Id.* at 6-7 (Tr. 23:22–24:1).

### D.    Mr. Singal Continues To Operate FC Retail as Its Owner for Months Following the Signing of the Purchase Agreement.

When Mr. Prasad failed to deliver those four documents, the parties carried on in their prior respective roles:  Mr. Singal as owner, and Mr. Prasad as president.  Mr. Prasad continued to present himself in the interim as the company's "President"—the title he held prior to signing the Purchase Agreement—rather than its owner, in email correspondence. *See, e.g.,* Ex. C at 50 (Tr. 187:12–22).  Mr. Singal, meanwhile, maintained his title as Managing Member in the interim.  *Id.* at 29 (Tr. 134:13–23).  The bank accounts for FC Retail also remained in Mr. Singal's name.  *Id.* at 32 (Tr. 137:15–18).  Likewise, Mr. Singal remained liable for payroll responsibilities, franchise dues, and landlord lease obligations. Ex. B. at 16 (Tr. 36:11–18).

The dynamic between the two—Mr. Prasad serving in a role subordinate to Mr. Singal—also remained unchanged. Critically, on July 7, 2017, Mr. Prasad requested Mr. Singal's approval for a salary raise.  Ex. C at 34-35 (Tr. 139:17–140:11).  Mr. Singal, as owner of FC Retail, signed off on the salary increase.  Ex. B. at 21 (Tr. 41:19–24).

Further consistent with his continuing interim ownership of FC Retail, Mr. Singal sought necessary supplemental outside funding for the company through a series of MCAs.  On April 4, 2017, Mr. Singal procured $197,370 from ESB Financial.  *See* Ex. G (Gov. Ex. 201).  On April 18, 2017, he procured approximately $165,000 from World Global Financing, Inc.  *See* Ex. H (Gov. Ex. 204); Ex. I (Gov. Ex. 206).  On April 19, 2017, he procured $294,946 from Happy Rock Merchant Solutions.  *See* Ex. J (Gov. Ex. 208).  On May 16, he procured $100,000 from Yellowstone Capital West.  *See* Ex. K (Gov. Ex. 212);

Ex. L (Gov. Ex. 216).[1]  And on May 17 and May 22, he procured approximately $50,000 from Global Merchant Cash ("iKahn Capital").  *See* Ex. M (Gov. Ex. 214); Ex. F at 28-29 (Tr. 56:25–57:1).

For each MCA, Mr. Singal accurately identified himself as the still-owner of FC Retail—because he was.  *See* Ex. N at 3, 9 (Tr. 48:13–16, 66:16–20); Ex. C at 3, 9, 16 (Tr. 17:13–25, 39:14–9, 66:16–18); Ex. F at 19 (Tr. 47:9–13); Ex. B at 28 (Tr. 51:6–8).  Mr. Singal also personally guaranteed the MCAs, taking personal responsibility for the loans should FC Retail have to default.  *See* Ex. N at 6, 12 (Tr. 55:16–20, 72:17–19); Ex. C at 6, 12-13, 19-20 (Tr. 24:21–24, 49:5–50:6, 69:19–70:17); Ex. F at 25 (Tr. 53:11–19); Ex. B at 28 (Tr. 51:12–21).

All the while, Mr. Prasad delayed delivering the requisite documents necessary to assume ownership of FC Retail.  Ex. B at 16 (Tr. 36:2–7).  As the delays continued, Mr. Singal "started contacting Mr. Prasad quite a bit" and "upping the pressure on delivering [the documents]" in June to effectuate the actual close.  *Id.* at 16-17 (Tr. 36:19–37:4).

Mr. Prasad finally addressed his contractual obligations to complete the purchase of FC Retail that summer, at some point ***after*** Mr. Singal submitted the MCAs.  In the months after signing the agreement, Mr. Prasad emailed Mr. Singal a copy of the signed Promissory Note.  *See* Ex. O (Joint Exhibit JX-6); Ex. C at 47 (Tr. 178:3–9) (Mr. Prasad testifying on direct that he signed the Promissory Note on a later date after February 23, 2017, but could not remember the specific date).  Then, on June 2, 2017, an individual associated with the BDC Freedom Capital, Conner Prochaska, requested an update from Mr. Prasad's counsel on the other documents required to effectuate the sale—the Pledge Agreement, the Security Agreement, and the Company Guaranty.  *See* Ex. P (Def. Ex. CV).  On June 6, 2017, Ryan Lochan (Mr. Prasad's attorney and son) replied, "Just wanted to let you know that we are working on finishing them up right now."  *Id.*  Mr. Lochan circulated those documents to Mr. Prasad and Mr. Singal for review later that day.  Ex. F

---

[1] Mr. Singal later refinanced, or restructured, this loan on June 9, 2017.  Ex. F at 22-23, 26 (Tr. 50:24–51:1; 54:1–15); Ex. L.

at 11 (Tr. 31:16–22); Ex. B at 19, 21 (Tr. 39:10–16; 41:13–18); Ex. P (6/6/17 email from Ryan Lochan with documents attached).[2]

### E.     Following the Completion of the Sale, Mr. Prasad Assumes Ownership of FC Retail.

As contemplated by the contract, only after Mr. Prasad addressed his contractual obligations under § 2.2.2 to complete the sale did he actually begin asserting ownership of FC Retail.  *See* Ex. C at 31-32 (Tr. 136:20–137:1) (Windy Myers testifying that Mr. Prasad did not begin to assert control of FC Retail until late August/early September 2017). In August 2017, Mr. Prasad moved FC Retail's operations out of Mr. Singal's Gold River office in Sacramento to Mr. Prasad's personal office.  *Id.* at 26 (Tr. 95:5–7); Ex. B at 22 (Tr. 42:6–14).  In late August or early September 2017, Mr. Prasad transferred ownership of FC Retail's bank accounts to himself.  Ex. C at 32 (137:7–18).  And in the middle of September, Mr. Prasad amended FC Retail's registration to reflect his new title as its managing member.  *Id.* at 29 (Tr. 134:13–19).  Shortly thereafter, FC Retail, with Mr. Prasad now listed as managing member, filed for bankruptcy.  Ex. F at 3 (20:11–13); Ex. B at 22-23 (Tr. 42:24–43:5).

### F.     The Government Brings Charges that Mr. Singal Misrepresented Ownership of FC Retail on Loan Documents.

On April 7, 2022, the government charged Mr. Singal with six counts of wire fraud and four counts of mail fraud.[3]  *See* Indictment, Dkt. 1.  The government alleged that Mr. Singal "signed a sale contract" pursuant to which FC REI sold FC Retail to Mr. Prasad. *Id.* § 6.  The government contended that "despite no longer having an ownership interest in" FC Retail, Mr. Singal proceeded to "appl[y] to third-party financing companies for

---

[2] Because the documents were dated February 23, 2017, it is unclear when the parties actually signed the documents to effectuate the closing.  *See* Ex. P (stipulation that the Promissory Note was signed "on some date after February 23, 2017").  The only evidence at trial confirmed that drafts were circulated on June 6, 2017, meaning Mr. Prasad must have revised and signed the documents at some point thereafter.

[3] The government later dismissed counts 5 (wire fraud) and 8 (mail fraud).  Dkt. 61, 62.

1  merchant cash advances." *Id.* §§ 7, 8.  Specifically, the government claimed that Mr.

2  Singal "provided false statements, including stating that SUNEET SINGAL was the owner

3  of [FC Retail] and was authorized to act on behalf of [FC REI]."  *Id.* § 9.  The government

4  alleged that the last of these MCAs occurred on June 9, 2017.  Ex. A at 6 (Tr. 11:5–6); Ex.

5  L.

6      **G.    The Court Defers Its Ruling Concerning Mr. Singal's Ownership of FC**

7           **Retail Until After Trial.**

8          Since the government issued its indictment, Mr. Singal has maintained consistently

9  that because Mr. Prasad did not deliver all contractually required documents at closing,

10  Mr. Singal was still the owner of FC Retail during the relevant time period in which he

11  executed the MCAs.  As early as October 31, 2024, Mr. Singal filed a motion to dismiss

12  on these grounds.  Dkt. 45.

13          Mr. Singal maintained this position during trial.  First, his counsel urged that the jury

14  be presented with a "theory of defense" that Mr. Singal was, in fact, the owner of FC Retail

15  when he entered into the MCAs.  Dkt. 96.  Then, when the government rested its case in

16  chief, Mr. Singal moved for a judgement of acquittal under Rule 29, again arguing that the

17  parties had not completed the contract until some date well beyond February 23, 2017.

18  Ex. F at 36-37 (Tr. 139:1–140:3).  The Court reserved its ruling until after the jury reached

19  its verdict.  *Id.* at 37 (Tr. 140:4–8).  Mr. Singal renewed his Rule 29 motion again thereafter,

20  and the Court confirmed the issue was preserved.  Ex. B at 35 (Tr. 71:17–22).

21          Mr. Singal's counsel also raised a new argument in support of his theory at that

22  juncture.   Defense counsel explained that any oral modification of the Purchase

23  Agreement's terms would have violated (i) California's Statute of Frauds, Ex. B at 3-4 (Tr.

24  9:25–10:7), and (ii) § 9.8 of the Purchase Agreement itself, which prohibited any

25  modifications not in writing, *id.* at 5 (Tr. 11:1–16).  The Court requested "full briefing" post-

26  trial, explaining that contractual question would be "well beyond what we're going to ask

27  the jury to do" and was "almost irrelevant" for jury deliberations because, if defense

28  counsel was correct on the law, "I think we're done here."  *Id.* at 4 (Tr. 10:12–15).

On June 23, 2025, the jury found Mr. Singal guilty on all counts.  Ex. A at 15 (Tr. 65:12–23).  Mr. Singal's timely Rule 29 motion follows.

**ARGUMENT**

Rule 29(c) of the Federal Rules of Criminal Procedure states, in pertinent part, that "[i]f the jury has returned a guilty verdict, the court may set aside the verdict and enter a judgment of acquittal."  "On a motion for judgment of acquittal, a court should set aside the jury's verdict only if, viewing the evidence in the light most favorable to the government, any rational trier of fact could not have found the essential elements of the crime beyond a reasonable doubt."  *United States v. Bennett*, No. SA CR 03-25 (B) AHS, 2006 WL 8435170, at *1 (C.D. Cal. May 24, 2006) (quoting *United States v. Johnson*, 804 F.2d 1078, 1083 (9th Cir. 1986)).  That standard is met here.

**I.    NO REASONABLE JUROR COULD HAVE FOUND THAT MR. SINGAL MADE A MATERIAL MISREPRESENTATION BECAUSE HE OWNED FC RETAIL WHEN HE REPRESENTED SUCH IN THE MCAs.**

Under California law, mutually concurrent conditions to a contract are dependent on each other and must be performed at the same time.  Because the Purchase Agreement explicitly and unambiguously required Mr. Prasad to deliver certain documents at closing, and Mr. Prasad failed to do so, Mr. Singal did not pass title of FC Retail upon signing the contract as a matter of law.  It follows that no reasonable juror could have found Mr. Singal's statements that he owned FC Retail to be false, and the government failed to establish a scheme to defraud beyond a reasonable doubt.

**A.    The Exchange of Mr. Singal's Ownership Interest in FC Retail and Mr. Prasad's Requisite Documents Were Mutually Concurrent Conditions.**

"A bilateral contract is one in which there are mutual promises given in consideration of each other."  *Bleecher v. Conte*, 29 Cal. 3d 345, 350, 698 P.2d 1154, 1156 (1981) (en banc).  California courts will "whenever possible . . . construe promises in a bilateral contract as mutually dependent and concurrent," meaning the conditions must be performed simultaneously and are dependent upon the other.  *Rubin v. Fuchs*, 1

1  Cal. 3d 50, 54, 459 P.2d 925, 928 (1969) (emphasis added); *see Colaco v. Cavotec SA*,

2  25 Cal. App. 5th 1172, 1182–83, 236 Cal. Rptr. 3d 542, 552 (2018) (explaining that

3  dependent covenants are "a condition precedent to the other party's performance").

4      In bilateral contracts with mutually dependent conditions, neither party is required

5  to perform absent the other party tendering performance.  *See Colaco*, 25 Cal. App. 5th

6  at 1183 ("one party is excused from its obligation to perform if the other party fails to

7  perform").  Likewise, neither party is in default until one party performs.  *Ninety Nine Invs.*

8  *v. Overseas Courier Serv. (Singapore) Priv.*, 113 Cal. App. 4th 1118, 1135, 6 Cal. Rptr.

9  3d 891, 903 (2003).

10      The obligation to perform under a bilateral contract, then, is dictated by the other

11  party's **performance**, not a mere signature.  California courts have recognized this for

12  more than a century.  *See, e.g., Southland Corp. v. Emerald Oil Co.*, 789 F.2d 1441, 1444

13  (9th Cir. 1986) (in contract where defendant was permitted to install equipment on

14  plaintiff's gas station and plaintiff would in turn get title to equipment, plaintiff received title

15  to equipment "upon its installation"); *Katemis v. Westerlind*, 120 Cal. App. 2d 537, 546–

16  47, 261 P.2d 553, 560 (1953) (holding contract for property "was in full force and effect"

17  only after defendant had given full performance of bilateral contract in delivering into

18  escrow termite report); *Kerr v. Reed*, 187 Cal. 409, 411, 202 P. 142, 143 (1921) (vendor

19  was only obligated to make a deed upon final payment under contract with dependent and

20  concurrent conditions).

21      That basic contract principle governs this case.  The Purchase Agreement is a

22  bilateral contract that clearly imposed mutually dependent and concurrent obligations

23  upon Mr. Singal and Mr. Prasad.  The Agreement laid out the simultaneous requirements

24  at Closing.  It stated that Mr. Singal "shall deliver" to Mr. Prasad (a) the membership unit

25  certificates representing the "Seller Units" (i.e., 100% ownership in FC Retail) and

26  (b) executed Pledge Agreements and Security Agreements.  Ex. D at 2 (§ 2.2.1).  It

27  continued that Mr. Prasad "shall deliver" (a) the Promissory Note, (b) Pledge Agreement,

28  (c) Security Agreement, and (d) Company Guaranty.  *Id.*  Those four documents were a

1    concurrent condition to Mr. Singal transferring ownership of FC Retail to Mr. Prasad, just

2    as Mr. Singal's conveyance of FC Retail was a concurrent condition to receiving the

3    Promissory Note.  Signature alone did not convey title of FC Retail to Mr. Prasad—rather,

4    each party was obligated to perform upon the other tendering performance.

### B. When Mr. Prasad Failed To Meet His Concurrent Obligations, Mr. Singal Retained Ownership of FC Retail.

7        Despite the Purchase Agreement imposing concurrent conditions upon Mr. Prasad

8    on the Closing Date, the evidence at trial unequivocally established that he failed to

9    perform requisite closing conditions on February 23, 2017.  In fact, as Mr. Prasad

10   conceded, he failed to deliver requisite documents for months thereafter.  Ex. F at 7-8 (Tr.

11   24:24–25:20).  Mr. Singal therefore did not transfer ownership of FC Retail to Mr. Prasad

12   on the Closing Day, his February 23, 2027 contract signature notwithstanding.

13       Under California law, a seller has three remedies at his disposal in the face of

14   unfulfilled contractual conditions.  First, he can "treat the contract as rescinded and []

15   recover upon a quantum meruit so far as he has performed."  *Chodos v. W. Publ'g Co.*,

16   292 F.3d 992, 1001 (9th Cir. 2002) (quoting *Alder v. Drudis*, 30 Cal. 2d 372, 381–82, 182

17   P.2d 195, 201 (1947)).  Second, he can "keep the contract alive, for the benefit of both

18   parties, being at all times ready and able to perform."  *Id.*  Or third, he can "treat the

19   repudiation as putting an end to the contract for all purposes of performance, and sue for

20   the profits he would have realized if he had not been prevented from performing."  *Id.*

21       The government presented no evidence at trial consistent with the first or third

22   options; Mr. Singal neither treated the contract as rescinded nor sued for profits.  Instead,

23   the evidence established that Mr. Singal kept the contract alive for the benefit of both him

24   and Mr. Prasad, ready to transfer ownership upon the delivery of the four documents under

25   § 2.2.2.  *See Tas-T-Nut Co. v. Cont'l Nut Co.*, 125 Cal. App. 2d 351, 356, 270 P.2d 43, 46

26   (1954) (noting the "familiar rule" that "if an agreement be breached the party against whom

27   the breach is committed may refuse to accept the breach . . . thus keeping the contract

28   alive, but that if he does so he keeps it alive both for the benefit of himself and for that of

1  the other contracting party"). Even when viewing that evidence in the light most favorable

2  to the government, Mr. Singal retained FC Retail during that period prior to Mr. Prasad

3  fulfilling his contractual obligations.

### C. Mr. Prasad's Newfound Belief that He Was Not Bound by the Purchase Agreement's Written Requirements Is of No Consequence.

6  Despite both the Purchase Agreement's language requiring that Mr. Prasad deliver

7  the requisite documents at closing **and** the parties' contemporary conduct supporting that

8  interpretation of the Purchase Agreement, the government nevertheless argued at trial

9  that the Purchase Agreement's closing condition language was somehow irrelevant.

10  Specifically, the government relied on Mr. Prasad's testimony when the prosecution asked

11  him whether he believed he needed to provide the Promissory Note to gain ownership of

12  FC Retail. Ex. C at 47 (Tr. 178:10–12). Mr. Prasad testified that he did not "[b]ecause I

13  didn't understand it to be like that at that point." *Id.* (Tr. 178:10–16). The prosecution

14  continued, "When you signed the Membership Interest Purchase Agreement, did anyone

15  tell you needed to provide the Promissory Note to complete the sale?" *Id.* (Tr. 178:17–

16  19). Mr. Prasad replied, "No." *Id.* (Tr. 178:20). Mr. Prasad explained that he believed he

17  could "[s]ign the documents later." Ex. F at 13 (Tr. 33:8).

18  Based on that testimony, the government concluded in its closing that "completing

19  the Promissory Note later was not particularly important . . . . 2.2.2 is just paperwork to

20  be filled out; i's to dot, t's to cross. It's not important." Ex. A at 7, 12 (Tr. 12:16–17, 17:17–

21  21). The government's interpretation of the Purchase Agreement is wrong as a matter of

22  law for three reasons. No reasonable juror could have found that Mr. Prasad was not

23  obligated to complete the § 2.2.2 documents to effectuate the closing.

24  **First**, the government presented no evidence that the parties ever orally modified

25  the Purchase Agreement. Mr. Prasad only testified to his **belief** of what the Purchase

26  Agreement required—that he "didn't understand [the Promissory Note] to be like that." Ex.

27  C at 47 (Tr. 178:10–12). Mr. Prasad never suggested that he and Mr. Singal agreed to

28  any alteration of the Purchase Agreement. Without some evidence that the parties

1  actually agreed to change the contract, what governs is the Purchase Agreement itself,

2  not Mr. Prasad's belief about its meaning.  *See Stewart v. Preston Pipeline Inc.*, 134 Cal.

3  App. 4th 1565, 1587, 36 Cal. Rptr. 3d 901, 919 (2005) (quoting *Beard v. Goodrich*, 110

4  Cal. App. 4th 1031, 1040, 2 Cal. Rptr. 3d 160, 167 (2003)) ("Mutual assent to contract is

5  based upon objective and outward manifestations of the parties; a party's 'subjective

6  intent, or subjective consent, therefore is irrelevant.'").  California bars such attempts at

7  diversion from written contractual requirements for situations exactly such as this.

8  ⠀⠀⠀⠀**Second**, even if had Mr. Singal and Mr. Prasad had orally agreed to modify § 2.2.2,

9  that modification would have been ineffective and invalid under California's Statute of

10  Frauds.  *See* Ca. Civ. Code §§ 1624 and 1698.  The Statute of Frauds dictates that certain

11  agreements, including financing agreements, must be in writing and signed by both parties

12  to be enforceable, to "require reliable evidence of the existence and terms of the contract

13  and to prevent enforcement through fraud or perjury of contracts never in fact made." *Est.*

14  *of Duke*, 61 Cal. 4th 871, 889, 352 P.3d 863, 874 (2015) (citation omitted).  Critically, "[a]n

15  agreement to modify a contract that is subject to the statute of frauds is also subject to the

16  statute of frauds."  *Secrest v. Sec. Nat'l Mortg. Loan Tr. 2002-2*, 167 Cal. App. 4th 544,

17  553, 84 Cal. Rptr. 3d 275, 282 (2008), *as modified on denial of reh'g* (Nov. 3, 2008)

18  ⠀⠀⠀⠀California's Statute of Frauds applies here because the Purchase Agreement

19  included a "commitment to loan money or to grant or extend credit, in an amount greater

20  than one hundred thousand dollars ($100,000), not primarily for personal, family, or

21  household purchases, made by a person engaged in the business of lending or arranging

22  for the lending of money or extending credit." Cal. Civ. Code §§ 1624(a)(7).  *See* Ex. B at

23  29 (Tr. 52:23–25) (Mr. Singal testifying that he has been a member of the American

24  Association of Private Lenders).  Specifically, the Purchase Agreement provided that FC

25  REI (and, in turn, Mr. Singal) would extend credit to Mr. Prasad by allowing him to

26  purchase FC Retail in exchange for a Promissory Note under which he agreed to pay FC

27  REI $11,500,000 over time, as well as 6% annual interest.  Purchase Agreement § 1.2;

28  *see also* Ex. A at 7 (Tr. 12:10–11) (government acknowledging in its closing the Purchase

1  Agreement's "interest rates, terms of maturity for interest rates, extensions, extension

2  fees").  The Pledge and Security Agreement confirm that understanding, reciting that FC

3  REI (and, in turn, Mr. Singal) was "***extend[ing] credit*** to [Mr. Prasad] pursuant to that

4  certain Secured Promissory Note . . . for the purpose of [Mr. Prasad] purchasing 100% of

5  the membership interests" in FC Retail.  *See* Ex. Q at 1 (Gov. Ex. 103 at 1) (emphasis

6  added).

7       Because the Statute of Frauds applied to the Purchase Agreement, only a written

8  modification—not simply an oral agreement or tacit understanding—could have altered

9  the requirement in § 2.2.2 that Mr. Prasad deliver a signed Promissory Agreement, Pledge

10  Agreement, Security Agreement, and Company Guaranty in order to close the transaction.

11  The government never presented any such written modification, however, because no

12  such written modification existed.

13       ***Third***, even if the Statute of Frauds did not apply to require that any modifications

14  be expressed in writing, the Purchase Agreement itself imposes that requirement.  Section

15  9.8 expressly states, "No term or provision of this Agreement may be amended, waived,

16  discharged or terminated orally but only by an instrument in writing signed by the Party

17  against whom the enforcement of such amendment, waiver, discharge or termination is

18  sought."

19       Even where provisions preclude oral modification, such as § 9.8, California law

20  nevertheless will permit parties to waive contractual rights "by their words or conduct."

21  *Wind Dancer Prod. Grp. v. Walt Disney Pictures*, 10 Cal. App. 5th 56, 78, 215 Cal. Rptr.

22  3d 835, 853 (2017).  But, as explained above, the government presented no evidence that

23  Mr. Prasad and Mr. Singal ever waived the Promissory Note requirement, either by their

24  words or conduct.  As discussed in Part II *supra*, the evidence showed the opposite:  Mr.

25  Prasad only began to assume ownership of FC Retail after completing his contractual

26  obligations in the summer of 2017.

27       Given these facts and legal requirements, no reasonable juror could have found

28  that the government was correct in arguing that § 2.2.2 was just "not important."  Ex. A at

12 (Tr. 17:17–18); *see also id.* at 7 (Tr. 12:16–17; 17:21).  Rather, § 2.2.2 prevented the transfer of title to FC Retail on February 23, 2017.  Accordingly, Mr. Singal was not guilty as a matter of law.

### D.  The Government Did Not Prove Beyond a Reasonable Doubt that Mr. Singal Made a False Statement When He Asserted He Owned FC Retail in His MCA Applications.

Absent evidence that the parties modified the Purchase Agreement, Mr. Singal owned FC Retail as a matter of law until some point in the summer of 2017, when Mr. Prasad completed his contractual obligations.  It follows that Mr. Singal did not lie in his MCA applications when he stated he owned FC Retail between April 4 and June 9, 2017.

The timeline here is straightforward.   Mr. Singal and Mr. Prasad signed the Purchase Agreement on February 23, 2017.  The government alleges that Mr. Singal then signed seven MCAs between April 4, 2017 and June 9, 2017.  In each MCA, Mr. Singal represented that he owned FC Retail.

But the government did not present any evidence showing that Mr. Prasad completed his contractual obligations *prior* to Mr. Singal signing these seven MCAs, as it concedes.  *See* Ex. P.  Indeed, Mr. Prasad admitted to signing the Promissory Note *well after* the Purchase Agreement.  Ex. C at 47 (Tr. 178:3–5).  The record further reveals that as late as June 6, 2017, the parties were still circulating *unsigned drafts* of Mr. Prasad's required paperwork.  Ex. F at 11 (Tr. 31:16–22); Ex. P.  Mr. Singal testified that he believed Mr. Prasad did not complete the documents until "sometime in July"; at trial, the government never argued otherwise.  Ex. B at 21 (Tr. 41:19–24).  The government therefore did not meet its burden of proof to support any finding that Mr. Singal had divested ownership of FC Retail prior to signing the MCAs.

Absent any evidence that Mr. Prasad had met his contractual obligations prior to Mr. Singal entering into the MCAs, no juror could have found that Mr. Singal made a "false statement" as the government contended.  His conviction should be overturned on these grounds.  *See United States v. Connolly*, 24 F.4th 821, 843 (2d Cir. 2022) (overturning

1  conviction of wire fraud where government failed to present evidence to show falsity in

2  representations).

3  **E.    Mr. Singal's SEC Testimony Has No Bearing Here.**

4  Finally, Mr. Singal's SEC testimony is irrelevant to whether he legally transferred

5  title.  A cornerstone of the government's case was Mr. Singal's 2018 SEC testimony in

6  which he told SEC officials that Mr. Prasad owned FC Retail pursuant to the February 23,

7  2017 contract.  That testimony has no legal significance here.

8  To start, Mr. Singal's testimony to the SEC was entirely consistent with his

9  testimony during trial.  Mr. Singal explained that his 2018 testimony to the SEC merely

10  expressed his understanding of the Purchase Agreement *as of 2018*, after speaking with

11  his attorneys regarding the 40 Act.  Mr. Singal emphasized throughout his testimony that,

12  in 2017, he believed he owned FC Retail until Mr. Prasad turned over the requisite

13  documents under § 2.2.2.  *See, e.g.,* Ex. B at 15 (Tr. 35:6–8) (agreeing that the documents

14  were necessary "to effectuate that transfer" of the business); *id.* at 16 (Tr. 36:11–12) ("all

15  we had simply done at that point was entered into an agreement to sell the business at

16  some later date"); *id.* at 19 (Tr. 39:2–3) ("Because the document, the contract had not

17  been satisfied, it was not viewed as a sale having taken place.").  Then, a year later, Mr.

18  Singal learned that the SEC was investigating the sale of FC Retail.  *Id.* at 23 (Tr. 43:11–

19  14).  Mr. Singal "hired lawyers to go out there and investigate the matter" because he

20  "didn't know the 40 Act," and he "deferred to lawyers to kind of guide [him] on that process."

21  *Id.* at 24 (Tr. 44:21–23).  Those lawyers told Mr. Singal that his understanding of the

22  Purchase Agreement was incorrect because the contract actually effectuated transfer of

23  FC Retail on February 23, 2017.  *Id.* at 26 (Tr. 46:2–11).  Hence, Mr. Singal told the SEC

24  exactly that.  *Id.*  That legal advice, of course, proved incorrect, as Mr. Singal has since

25  come to learn.

26  But regardless of whether Mr. Singal did or did not believe he transferred FC Retail

27  on February 23, 2017, the terms of the Purchase Agreement remain the same—title did

28  not transfer as a matter of law until Mr. Prasad fulfilled his contractual obligations.  Even

1    if this Court finds under the Rule 29 standard that Mr. Singal believed he transferred

2    ownership prior to signing the MCAs and intended to lie to the lenders, that fact is wholly

3    irrelevant to § 2.2.2.  The indictment charged Mr. Singal with making a *false* statement, as

4    the government argued at trial.  *See* Ex. A at 3 (Tr. 8:11–14) (government stating in closing

5    arguments, "Mr. Singal devised a scheme to defraud or obtain money by false

6    representation, pretenses, or promises.  *I'll show that in false statements.*") (emphasis

7    added).  If the alleged false statement was not actually false, the government cannot meet

8    its burden under any standard, much less beyond a reasonable doubt.

9    **II.  A RATIONAL JUROR COULD NOT FIND BEYOND A REASONABLE**
10   **DOUBT THAT MR. SINGAL HAD THE INTENT TO DEFRAUD.**

11       It is clear under California law that Mr. Singal retained ownership of FC Retail after

12   signing the Purchase Agreement.  But even if Mr. Singal somehow legally had transferred

13   ownership on February 23, 2017, the undisputed evidence at trial demonstrated that

14   neither Mr. Singal nor Mr. Prasad understood that to be the case from March through July

15   2017, during the duration of the scheme to defraud alleged in the indictment.  *See*

16   Indictment ¶ 4.

17       Wire and mail fraud convictions require a specific intent to defraud.  *United States*

18   *v. Galecki*, 89 F.4th 713, 737 (9th Cir. 2023), *cert. denied*, 145 S. Ct. 546 (2024).  A good

19   faith mistake negates that intent.  *United States v. Scarmazzo,* 554 F. Supp. 2d 1102,

20   1110 (E.D. Cal. 2008), *aff'd sub nom. United States v. Montes*, 421 F. App'x 670 (9th Cir.

21   2011).  "[E]vidence establishing only that a person made a mistake of judgment or an error

22   in management, or was careless, does not establish fraudulent intent."  *United States v.*

23   *Tarallo*, 380 F.3d 1174, 1191–92 (9th Cir. 2004), *amended*, 413 F.3d 928 (9th Cir. 2005).

24       A court may discern intent by looking at the parties' conduct prior to controversy.

25   "The rule is well-settled that in construing the terms of a contract the construction given it

26   by the acts and conduct of the parties with knowledge of its terms, and before any

27   controversy has arisen as to its meaning, is admissible on the issue of the parties' intent."

28   *S. Cal. Edison Co. v. Superior Ct.*, 37 Cal. App. 4th 839, 851, 44 Cal. Rptr. 2d 227, 234

1   (1995), *as modified on denial of reh'g* (Sept. 7, 1995); *see also Oceanside 84, Ltd. v. Fid.*

2   *Fed. Bank*, 56 Cal. App. 4th 1441, 1449, 66 Cal. Rptr. 2d 487, 492 (1997) ("the conduct

3   of the parties after the execution of the contract, and before any controversy arose, may

4   be considered in order to attempt to ascertain the parties' intention").  Mr. Singal and Mr.

5   Prasad's conduct in the months after they signed the Purchase Agreement plainly

6   evidences that they intended transfer of title be dependent upon Mr. Prasad's actual

7   delivery of requisite documents, not the mere exchange of promises in February 2017.

8       Numerous facts at trial illustrated their understanding.  First, Mr. Singal maintained

9   his title as FC Retail's "Managing Member," and Mr. Prasad its president.  Ex. C at 29 (Tr.

10  134:20–23).  And the two acted in accordance with their respective titles.  Mr. Singal's

11  assistant, Cynthia Campbell, testified that Mr. Singal remained the owner and person in

12  charge through June of 2017.  Ex. F at 32-33 (Tr. 135:21–136:8).  Most strikingly, Mr.

13  Prasad **asked Mr. Singal for a raise** in his role as president of FC Retail on July 7, 2017.

14  Ex. C at 33-35 (Tr. 138:8–140:11); Ex. B at 17 (Tr. 37:13–21).  It is axiomatic that an owner

15  would not ask someone else for a raise.  Mr. Prasad's request makes clear that both

16  parties understood Mr. Singal still owned FC Retail; had Mr. Prasad already taken over

17  FC Retail, he obviously would not have needed Mr. Singal's permission to increase his

18  own salary.

19      Mr. Singal's belief that title had not yet transferred is also corroborated by the fact

20  that he remained responsible for FC Retail's liabilities.  Ex. B at 16 (Tr. 36:8–18).  In

21  California, "[t]he general rule is that risk of loss follows title." *Francis H. Leggett & Co. v.*

22  *Cnty. of Los Angeles*, 235 Cal. App. 2d 752, 754–55, 45 Cal. Rptr. 561 (Ct. App. 1965).

23  Tellingly here, Mr. Singal personally guaranteed the MCAs—the same MCAs the

24  government alleges were used to defraud lenders.  All the government's witnesses

25  confirmed:  Mr. Singal personally guaranteed the loans he sought, such that he would be

26  responsible for any subsequent loss.  *See* Ex. N at 6 (Tr. 55:16–20) (Gavin Harris), 12 (Tr.

27  72:17–19) (Jeffrey Kahn); Ex. C at 6 (Tr. 24:21–24) (Rick Geller), 12-13 (Tr. 49:5–50:6)

28  (Cyril Eskenazi), 19-20 (Tr. 69:19–70:17) (Mariam Milian); Ex. F at 25 (Tr. 53:11–19) (Tvsi

Davis). A rational juror would not find that Mr. Singal knowingly made a material misrepresentation about his ownership of FC Retail, thereby committing fraud, while simultaneously putting himself on the hook for any loss therefrom. *See, e.g., In re Rauf*, 504 B.R. 838, 851 (Bankr. E.D. Mich. 2014) (finding that debtor did not have intent to deceive where he signed personal guaranty, "thereby ensuring they would both be responsible personally," and thus "the economic motivation to deceive is significantly less"). Such facts are irreconcilable by any reasonable standard.

The eventual transfer of title later that summer is consistent with Mr. Singal's good-faith belief that he owned FC Retail when he completed the MCAs. Prior to transferring ownership, Mr. Singal explained that he "started contacting Mr. Prasad trying to chase down documents" in the months after to effectuate the sale. *See* Ex. B at 16 (Tr. 36:19–22). Mr. Singal ramped up his efforts "during the month of June specifically," as he needed to ensure the sale was completed by "the end of the second quarter." *Id.* at 16-17 (Tr. 36:25–37:4).

The evidence also established that once Mr. Prasad finally met his concurrent obligations, he did in fact assume ownership of FC Retail. Windy Myers testified that Mr. Prasad only began asserting control of FC Retail in late August and early September 2017, upon signing and delivering the § 2.2.2 documents. Ex. C at 31-32 (136:20–137:1). It was at that point that Mr. Prasad finally moved FC Retail's operations out of Mr. Singal's office and changed FC Retail's bank accounts to his name. *Id.* at 26; 32 (Tr. 95:5–7; 137:7–18); Ex. B at 22 (Tr. 42:6–14). In the middle of September, Mr. Prasad amended FC Retail's registration to reflect that he was now its Managing Member. Ex. C at 29 (Tr. 134:13–23). Mr. Prasad did not take any of these actions prior to submitting all documents required under the Purchase Agreement because he did not own FC Retail.

The parties' conduct in 2017 is not inconsistent with Mr. Singal's testimony to the SEC in 2018, contrary to the government's arguments otherwise. Whatever his belief was regarding the Purchase Agreement in 2018 after conferring with his attorneys, his **contemporaneous belief** in the spring of 2017 was that Mr. Prasad had not yet assumed

ownership of FC Retail.  The parties' actions undertaken during that span support only that conclusion.

Consequently, even if this Court somehow found that Mr. Singal legally transferred his ownership of FC Retail prior to applying for the MCAs, no reasonable juror could have found that Mr. Singal believed that to be the case when he signed the MCAs.  And if Mr. Singal believed he owned FC Retail, the government did not prove beyond a reasonable doubt that he had the requisite intent to defraud.  On that basis, the Court should vacate the jury's verdict and enter an acquittal even if it concludes that Mr. Singal somehow legally transferred ownership on February 23, 2017.

**CONCLUSION**

For these reasons, the Court should set aside the jury's verdict of guilty on counts 1–4, 6–7, and 9–10, and enter a judgment of acquittal.

1        DATED this 4th day of November 2025.

2

3    PAUL HASTINGS LLP

4    By:   /s/ Bradley J. Bondi

5    Bradley J. Bondi (#465132 (D.C.))        Renato Mariotti (#226447 (CA))
     (*Pro Hac Vice*)                         PAUL HASTINGS LLP
6    Benjamin W. Snyder (#1020481 (D.C.))     71 S. Wacker Dr., 45th Floor
     (*Pro Hac Vice*)                         Chicago, IL 60606
7    PAUL HASTINGS LLP                        Telephone: 312.499.6005
     2050 M Street NW                         Facsimile: 312.499.6105
8    Washington, D.C. 20036
     Telephone: 202.551.1700
9    Facsimile: 202.551.0201

10   *Attorneys for Defendant Suneet Singal*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28